HARVEY DOUD and MARY E. DOUD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doud v. Commissioner
Docket No. 14335-80.
United States Tax Court
T.C. Memo 1982-158; 1982 Tax Ct. Memo LEXIS 588; 43 T.C.M. (CCH) 916; T.C.M. (RIA) 82158; March 29, 1982. Harvey Doud, pro se. Patrick J. Dowling, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the calendar year 1975, in the amount of $ 9,210.02. The issues for decisions are: (1) whether petitioners incurred a casualty loss in 1975 from the theft of a stamp collection; (2) whether petitioners recognized income from the receipt of funds and cancellation of indebtedness in settlement of a lawsuit; and (3) whether petitioners are entitled to deduct automobile expenses in excess of the amount determined by respondent. FINDINGS OF FACT Some of the facts have been *589 stipulated and are so found. Petitioners are husband and wife who resided in Lawrence, Kansas, at the time the petition herein was filed. They filed their joint Federal income tax return for 1975 with the Director of Internal Revenue Service Center in Austin, Texas. Mary E. Doud is a party to this proceeding solely by virtue of having filed a joint income tax return with her husband; consequently, Harvey Doud will hereinafter be referred to as petitioner. On August 22, 1962, petitioner borrowed $ 2,516 from the Baltimore Bank and Trust Co. (hereinafter the bank) located in Kansas City, Missouri. [1] The transaction was handled by Homer M. Eccles (hereinafter Eccles), then an assistant vice president of the bank's installment loan department. As security for the loan petitioner delivered to Eccles a cardboard box containing stamps. This box measured approximately 15 by 12 by 6 inches. Petitioner and his wife had prepared an itemized list of the stamps in the box, copies of which were placed in the box, attached to the note, and kept by petitioner. The box was sealed by Eccles and then was taken by him and petitioner to a safekeeping vault [2] where it was deposited. Petitioner *590 was issued a receipt for the stamps which provided that the declared value of the stamps was $ 3,145, and that access to the box required the presence of petitioner and either Eccles or Mr. Lindemood, another officer of the bank. Petitioner renewed this loan several times (at least 14) between 1964 and 1971. During 1963, respondent conducted an examination of petitioner because of his failure to file income tax returns for 1960, 1961, and 1962. After petitioner filed all of the delinquent returns in 1964, petitioner presented to respondent's agent a large cardboard box containing real estate records. Shortly thereafter respondent's agent requested, and petitioner supplied, petitioner's banking records. Petitioner was told that the records would be kept by respondent's intelligence division so that they could be studied by a revenue agent. John W. Merrett *591 (hereinafter Merrett) was the revenue agent (field auditor) assigned to petitioner's case in 1964. He examined petitioner's returns with the help of the records furnished by the intelligence division, specifically those regarding petitioner's real estate and banking transactions. Merrett first met petitioner in April 1965. At or about that time he gave petitioner a box containing some of the latter's records, but he retained some records also. In early 1966, petitioner went to Merrett's office and demanded the return of his records and he was given those records the IRS had in its possession. Petitioner's demand was prompted by communications between him and an individual who had received some of petitioner's records in the mail from the IRS. In a letter dated October 4, 1968, the IRS admitted to petitioner that it had erroneously sent some of his records to a disinterested third party and apologized for the error. In mid-1966 petitioner realized that he no longer had his copy of the list of stamps used as collateral for the loan at the bank. It was his belief that the list had been part of the records mismailed by the IRS which had not been returned. At that time petitioner *592 called the bank to have a copy made of the list attached to the note and sent to him. Despite repeated requests, petitioner never received a copy of the list from the bank. On December 29, 1966, Eccles became worried about the collateral on petitioner's loan. On that date he and Mr. Sunderland, a vice president and security officer of the bank, opened the box and inventoried its contents. Eccles never notified petitioner that such an inventory would be, or was, taken. At trial Eccles could not recall whether the seal on the box had been broken prior to the inventory of its contents. On or about August 18, 1972, petitioner sent his attorney to the bank to demand the list of stamps held as collateral. The attorney was told that there was no list. It was about that time that petitioner learned that the box had been opened. After a survey of the contents of the box petitioner found that the list had been removed and that a substantial number of stamps were missing. After discovering the missing stamps petitioner brought an action for damages against the bank in a Missouri circuit court. Therein petitioner claimed damages in the amount of $ 3,145, plus interest from June 2, 1972. *593 The bank counterclaimed that petitioner owed it $ 1,700, plus $ 283.33 interest from January 1, 1972 through November 1, 1974. On or about December 30, 1975, petitioner and the bank entered into a "mutual release" pursuant to which petitioner dismissed the action against the bank, and the bank paid petitioner $ 698.58, canceled the petitioner's debt of $ 1,700, and returned to petitioner the stamps remaining in the bank's possession (face amount $ 400.22). On his return for 1975, petitioner deducted a theft loss of $ 49,900 resulting from the uncompensated disappearance of a substantial portion of his stamp collection. Additionally, he deducted automobile expenses of $ 8,221. Respondent has determined that petitioner is not entitled to any casualty or theft loss in 1975 because he has not established that a loss was actually sustained. Further, respondent determined that petitioner recognized $ 2,398.58 of income resulting from his settlement with the bank. Finally, respondent disallowed $ 989 of petitioner's claimed automobile expenses for 1975. OPINION The primary issue presented in this case is to what extent, if at all, stamps were stolen from petitioner while held *594 by the bank as collateral for a loan. Further, if it is concluded that a theft did occur, we then must determine the extent of petitioner's deductible loss therefrom under section 165. [3]
Section 165(c) permits individuals to deduct losses resulting, inter alia, from theft to the extent that the loss exceeds $ 100 and is not compensated for by insurance or otherwise. The measure of the loss sustained due to theft is the lesser of the fair market value of the property or its adjusted basis. Helvering v. Owens,305 U.S. 468 (1939); Pfalzgraf v. Commissioner,67 T.C. 784 (1977); secs. 1.165-7(b) and 1.165-8(c), Income Tax Regs. The taxable year in which the loss is deductible is the year in which the loss is discovered, or if in that year a claim for reimbursement exists with respect to the loss, then the year of deduction is the year in which the loss may be ascertained with reasonable certainty. Secs. 1.165-8(a)(2) and 1.165-1(d)(2), Income Tax Regs.
The questions presented regarding *595 petitioner's deduction of a theft loss, i.e., the occurrence of a theft, the magnitude thereof, and the adjusted basis and fair market value of stamps stolen, are all factual issues to which petitioner bears the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). [4]
Upon careful review of the extensive record presented in this matter, we believe that a theft of some of petitioner's stamps did occur while they were held by the bank as collateral for his loan. We find petitioner's testimony credible that he inventoried the stamps and prepared a complete list prior to taking out the loan. We also believe that a copy of that list was placed in the sealed box of stamps and attached to the promissory note signed by petitioner. [5]
Moreover, the testimony of Eccles, a vice president *596 of the bank who transacted the loan with petitioner, is entirely incredible. First, Eccles would have us believe that he accepted the box of stamps as collateral from petitioner without ever so much as glancing to see that stamps were in the box. Apparently, for all Eccles knew, the box could have contained shredded newspapers. Second, Eccles testified that, basically on a whim, he decided to inventory the petitioner's stamps in 1966 to see that the collateral was sufficient to cover the amount of the loan. He proceeded to clearly violate the bank's instructions regarding the collateral by entering the box without the petitioner being present. He never informed the petitioner of his intention to inventory the collateral prior to doing so, nor did he subsequently tell petitioner that he had done so. This is particularly unconvincing since the stamps reported on Eccles' inventory totaled less than one-third of the loan balance. If he was so worried about the security for the loan one would reasonably expect him to have taken some prompt action upon learning that the collateral was insufficient to cover the loan. If Eccles' story is to be believed petitioner apparently violated *597 the loan contract by misrepresenting the face value of stamps in the box, and the bank could have called in the loan. We do not find that Eccles took petitioner's stamps. It may well be that the seals were broken prior to Eccles' inventory, and that his testimony merely reflects a desire to protect the bank's good name. In any case, however, the facts do indicate that a theft occurred.
It is virtually impossible for us to determine with precision the magnitude of the theft. Expert testimony revealed that the list of U.S., Canadian and U.N. stamps submitted by petitioner as stolen is as incredible as Eccles' testimony. Several boxes the size of the one petitioner gave to the bank would be needed to store them. Additionally, the value of all the stamps on that list would have well exceeded $ 100,000. Finally, petitioner's own testimony revealed its exaggeration. He stated that he prepared the list from memory, and that it is "not accurate * * * this is just a rough copy * * * I remembered big." He explained "they [the IRS] cheated me * * *. I said to them, 'you remembered very small when you perpetrated this fraud on me, * * * and so I am remembering very big on this to counterbalance *598 it.'" Notwithstanding that we cannot determine the exact loss incurred by petitioner, including Canadian and U.N. stamps, we can calculate a minimum loss. Petitioner pledged U.S. stamps with a face amount of $ 3,145 for the loan. U.S. stamps were returned to him with a face value of $ 400.22. Consequently, his loss was no less than $ 2,744.78. Petitioner has not proved the fair market value of the stamps. The nature of the U.S. stamps, however, is that their fair market value was at least equal to their face amount. Additionally, their cost, regardless when purchased or by whom, would have been at least face value. Thus, we find that the adjusted basis and fair market value of stamps stolen from petitioner was $ 2,744.78. Petitioner received as a settlement from the bank $ 698.58, and forgiveness of a $ 1,700 debt. Therefore, he was compensated for his loss to the extent of $ 2,398.58. Consequently, petitioner's uncompensated loss totaled $ 346.20. His allowable deduction under section 165(c)(3) is $ 246.20. Due to his outstanding claim against the bank, the proper year for deductibility is 1975, since that is when he settled with the bank and the amount of his loss *599 became certain. Furthermore, as a result of our finding that the amounts paid to petitioner by the bank constitute reimbursements for the theft of his stamps at their bases, petitioner does not realize any income therefrom. Finally, regarding respondent's disallowance of certain automobile expenses in excess of the amount determined by respondent, petitioner has produced no evidence whatsoever. Thus, respondent's determination must prevail. Rule 142(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The name of the bank was subsequently changed to Boatmen's Bank and Trust of Kansas City. ↩
2. The safekeeping vault was located in an area containing safe deposit boxes. The operation of the safe deposit area was conducted in conjunction with the bank by a separate corporation known as the Baltimore Safe Deposit Co.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
4. All references to the "Rules" refer to the Tax Court Rules of Practice and Procedure.↩
5. There is little doubt that petitioner's copy of the stamp list was lost. Whether this occurred through the negligence of the IRS in mismailing petitioner's records, or through petitioner's own negligence, is of no consequence to the outcome of the instant matter.↩